IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TUTUILA TUVALU,

    Plaintiff,                      No. CIV S-04-1724 RRB KJM P

    vs.

JEANNE WOODFORD, et al.,

    Defendants.                 FINDINGS AND RECOMMENDATIONS

_____/

        Plaintiff is a state prison inmate, proceeding pro se, with his vigorously litigated civil rights action challenging regulations that prevent him from having overnight visits with his family and particularly with the child he fathered while in prison, before the regulations were changed. Defendants have filed a motion for summary judgment and plaintiff has filed a motion for injunctive relief, stemming from the manner in which the California Department of Corrections and Rehabilitation (CDCR) collects the filing fees associated with litigation in federal court.

I. Standards For A Motion For Summary Judgment Under Fed. R. Civ. P. 56

        Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

1

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

1 return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On February 3, 2006 and June 14, 2006, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

/////

II. <u>Undisputed Facts</u>

In 1985 plaintiff was sentenced to prison for an indeterminate term of twenty-five years to life. Declaration of Tutuila Tuvalu In Support of Amended Complaint (Tuvalu Decl. I) (docket no. 57) ¶ 8; Motion For Summary Judgment (MSJ), Ex. H, Attach. 1.[1] At that time, under the authority of California Penal Code §§ 2600 and 2601 inmates retained several civil rights, which included the right "to have personal visits. However, the department may provide any restrictions that are necessary for the reasonable security of the institution." Cal. Pen. Code § 2601(d), <u>amended by</u> Stats. 1996, § 2, ch. 132 (S.B. 1221). Section 2600 provided that inmates could be deprived of those rights when necessary to provide for the reasonable security of the institution and the reasonable protection of the public. Administrative regulations permitted and still permit some inmates to have extended, semi-private (called family or overnight) visits with immediate family members. <u>Pro-Family Advocates v. Gomez</u>, 46 Cal.App.4th 1674, 1679 n.3 (1996). These regulations provide that "family visiting is a privilege." 15 Cal.Code Regs. § 3177(b).[2]

When plaintiff entered prison, he was married and the father of two children. Tuvalu Decl. I ¶ 9. Plaintiff's application for family visiting was approved and he was able to have overnight visits. These visits, which could be as long as seventy-two hours, gave plaintiff the opportunity to maintain and reestablish his relationship with his family. <u>Id</u>. During one of these visits, plaintiff and his wife conceived a daughter, who was born on August 15, 1995. Amended Complaint (Am. Compl.) ¶ 3. Plaintiff has had two family visits with his daughter. <u>Id</u>.; Opposition to MSJ (Opp'n) ¶ A 1.

/////

---

[1] In 1991, plaintiff was sentenced to an additional two years, concurrent to the underlying term, for assault with a deadly weapon on another inmate. MSJ, Ex. H-1 at 4.

[2] At the time plaintiff entered the correctional system, this provision was contained in 15 Cal. Code Regs. § 3174(f).

1 In 1995, the regulation governing family visiting was amended, but the implementation of the amendment was enjoined. MSJ, Ex. B, Attach. A at 2215; see also Pro-Family Advocates, 46 Cal.App.4th at 1679-80. This injunction was reversed on appeal and the amended regulation became final on November 18, 1996. MSJ, Ex. A. This amended regulation, current Title 15, California Code of Regulations § 3177, retains the provision identifying family visiting as a privilege; the Statement of Reasons for the amendment observes, "because it is unsupervised, it is a privilege based on trust, and that trust must also be earned." MSJ, Ex. B, Attach. A at 290. The regulation also provides that family visits are to be provided to eligible inmates commensurate with institutional security. 15 Cal. Code Regs. § 3177. The unsupervised nature of family visits suggested that inmates in high security classifications should not be allowed to have such visits. MSJ, Ex. B, Attach. A at 290. In addition, the amended regulation provides that certain classes of inmates, including prisoners serving life terms who have not been given parole dates, are not eligible for family visits. 15 Cal. Code Regs. § 3177(b)(2).

Prison officials determined that the privilege of family visiting should be extended only to those who would get the most benefit from it, such as those inmates who would be returning to their families within a known period of time, had not violated their family's trust by violent acts against them, were not a threat to society as a result of sexual predation, and had not engaged in serious in-prison misconduct. MSJ, Ex. B (No. 7) & Attach. A at 290-291. Officials also determined that for prisoners serving life terms ("lifers"), the hope of receiving family visits would cause them to comply with prison rules in order to secure a parole date. Id. at 519. In reaching these determinations, CDC officials relied on several considerations: that there had been numerous incidents in family visiting units; that the Legislature had amended California Penal Code section 2601; and that inmates with no parole dates were considered escape and security risks, such that allowing such inmates to have family visits was not compatible with public safety. Id. at 290-291, 519.

There are five family visiting units at High Desert State Prison, where plaintiff was housed when he filed the complaint. MSJ, Ex. I ¶ 4 (Beck Decl.). One, for Level I inmates, is outside the walls; the other four are inside the walls. Id. There are 40 to 50 inmates at HDSP who participate in the family visiting program, usually on weekends, and the units are typically fully booked during those times; if lifers without parole dates were approved for family visiting, the amount of time available for the other inmates would be reduced. Id.

At the time of the regulatory changes, plaintiff did not have a parole date and so was no longer eligible for family visits. Am. Compl. ¶ 31; MSJ, Ex. F (No. 7). On March 26, 2002, plaintiff's first parole hearing, he was denied parole for four years; on September 6, 2006, plaintiff was again denied parole, this time for three years. MSJ, Ex. H, Attach. 1 at 31-40, 43 & Ex. K ¶ 2 (Remy Decl.).

Plaintiff is allowed to have and has received regular visits with his wife and children as well as with others. Beck Decl. ¶ 3 & Attach. 1. These visits are governed by regulations that provide, among other things, that "children must be under the control of an adult . . . <u>at all times</u>. Running, throwing toys, yelling, or other bothersome behavior will not be tolerated." Tuvalu Decl. ¶ 59 & Ex. A ¶ 5 (visiting rules). In plaintiff's experience, these rules are often hard to follow when the visitor is "a curious young child." Tuvalu Decl. ¶ 60. Moreover, because the visits occur in a public area, plaintiff's child is often reluctant to discuss problems. Id. ¶ 66. Plaintiff's youngest child, the daughter conceived during a family visit, is not as comfortable with plaintiff as his older two children were at the same age. Id. ¶¶ 62-65. Plaintiff has become anxious to the point of insomnia and depression over the quality of the relationship with his daughter. Id. ¶¶ 73, 75, 82-83.

Since the amendments, inmate Seelva Mikaio, a lifer without a parole date, received three family visits: twice during the period when the amended regulation was enjoined and once after the regulation was enforced. MSJ, Ex. E (No. 5) & Ex. F (No. 8). However, the latter visit was approved in error and there is no record that he was approved for further family

1 visits after that.  MSJ, Ex. E (No. 5) & Ex. F (No. 8).

2    The parties dispute whether an inmate may earn the trust of prison officials and
3 thus become eligible for family visits despite their status as lifers, by becoming informants.
4 Compare MSJ, Ex. C (Nos. 23, 27), Ex. D (Nos. 4, 6), Ex. F (No. 25) & Ex. G (Nos. 2, 4) with
5 Tuvalu Decl. ¶¶ 23, 38-46.[3]  As explained below, however, this issue is not material to the
6 resolution of the motion for summary judgment.

7    Moreover, the parties dispute whether former Governor Pete Wilson adopted a
8 policy of not paroling murderers.  Compare MSJ, Ex. K ¶ 3 (Remy Decl.) with Tuvalu Decl.
9 ¶¶ 13-14.  Once again, however, the court does not find this dispute material: plaintiff did not
10 appear before the parole board until 2002, under the administration of Governor Gray Davis.
11 Plaintiff's most recent hearing was in 2006, under the administration of Governor Arnold
12 Schwarzenegger, who has approved parole for 128 lifers.  MSJ, Remy Decl. ¶ 5.  In addition,
13 plaintiff has proffered nothing suggesting that he would have been given a parole date at either
14 hearing had it not been for the existence of the "no parole" policy.

15 III. Analysis

16    Plaintiff argues that the change in regulations without a hearing violated his right
17 to procedural due process and that the regulation itself violates equal protection.  Defendants
18 argue that plaintiff's action against defendants Wilson, Sandoval and Gomez is barred by the
19 statute of limitations, that plaintiff's constitutional rights have not been violated, and that the
20 defendants are entitled to qualified immunity.

21 /////
22 /////
23 /////
24

---

25  [3] Plaintiff's declaration is not entirely based on his personal knowledge, as required by Federal Rules of Civil Procedure 56(e).  Nevertheless, even if it were properly supported, the
26 court would not find that the dispute it creates concerns a material fact.

A. Procedural Due Process

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of life, liberty or property without appropriate procedural protections. Wilkinson v. Austin, 545 U.S. 209, 221 (2005). Those who seek to invoke the procedural protections of the Due Process Clause must establish that one of these interests is at stake. Id. "A liberty interest may arise from the Constitution itself . . . , or it may arise from an expectation or interest created by state laws or policies." Id. Interests created by the state "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an expected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995).

Plaintiff suggests that his liberty interest arises from state law, specifically from subsection (d) of former Penal Code section 2601 and from the fact that, as recognized by the California courts, parental rights survive incarceration. Opp'n at 14 ¶ 42, 17 ¶ 51. These arguments are unavailing: plaintiff has not shown that the denial of family visits has placed him in a position substantially different from most other inmates. Sandin, 515 U.S. at 485; see also Kentucky Department of Corrections v. Thompson, 490 U.S. 454, 461 (1989) ("the denial of prison access to a particular visitor is 'well within the terms of confinement ordinarily contemplated by a prison sentence'"); Cooper v. Garcia, 55 F.Supp.2d 1090, 1098-99 (S.D. Cal. 1999) (no state created liberty interest in family visits). This is particularly true because even when former Penal Code section 2601(d) was in effect, the California Supreme Court recognized that "prison officials may ban overnight visits with inmates altogether . . . ." In re Cummings, 30 Cal.3d 870, 973 (1982). Moreover, even though incarceration does not, by itself, work a termination of the inmate's parental rights, this does not translate into an interest in a particular type of visitation while the parent is in prison. See, e.g., Cal. Welf. & Inst. Code § 361.5(e)(1)

/////

(reunification services between dependent child and incarcerated parent "may include . . . (c) visitation services, when appropriate").

Plaintiff also argues that he has a liberty interest in maintaining his relationship with his child that arises directly from the Due Process Clause. Opp'n at 26-27. This argument fails as well.

In <u>Overton v. Bazzetta</u>, 539 U.S. 126 (2003), the Supreme Court considered a challenge to a prison regulation that imposed a number of restrictions on visiting, including a complete ban on visitors except for lawyers and clergy for those inmates who had committed substance abuse violations. The Court observed:

> We have said that the Constitution protects certain kinds of highly personal relationships. And outside the prison context, there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family . . . . [¶] This is not an appropriate case for further elaboration of those matters. The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by prisoners. An inmate does not retain rights inconsistent with proper incarceration. And, as our cases have established, freedom of association is among the rights least compatible with incarceration. Some curtailment of that freedom must be expected in the prison context.

<u>Id</u>. at 131 (internal quotations, citations omitted). The Court also has stated that an inmate's "interest in unfettered visitation" is not guaranteed directly by the Due Process Clause. <u>Kentucky Department of Corrections</u>, 490 U.S. at 460. And while the Supreme Court has agreed that prison inmates retain the right to marry, it anticipated that the consummation of those marriages (and the concomitants to consummation) would not occur until the inmate's release from prison. <u>Turner v. Safley</u>, 482 U.S. 78, 96 (1987).

Several Courts of Appeals have found that prisoners have no liberty interest in intimate familial association, marital privacy, or contact visits. For example, in <u>Gerber v. Hickman</u>, 291 F.3d 617 (9th Cir. 2002), the court considered whether an inmate retained a due process right to have the prison accommodate his desire to impregnate his wife by artificial

9

insemination. It noted that "incarceration is simply inconsistent with the vast majority of concomitants to marriage, privacy, and personal intimacy" and concluded that the fundamental right of familial association was abridged by incarceration. Id. at 621-22. Rejecting a similar claim, the Court of Appeals for the 8th Circuit observed that "[b]y its very nature, incarceration necessarily affects the prisoner's family." Goodwin v. Turner, 908 F.2d 1395, 1399 (8th Cir. 1990). This same court also has rejected a claim that the Due Process Clause gives an inmate a liberty interest in contact visitation. Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003); see also Inmates of the Allegheny County Jail v. Pierce, 612 F.2d 754, 758-59 (3d Cir. 1979) (pretrial detainees have no constitutional right to contact visits). The Second Circuit has found that an inmate has no liberty interest in conjugal visits, because "rights of marital privacy, like the right to marry and procreate, are necessarily and substantially abridged in a prison setting." Hernandez v. Coughlin, 18 F.3d 133, 137 (2d Cir. 1994); Gordon v. Woodbourne, 481 F.Supp.2d 263 (S.D.N.Y. 2007) (no liberty interest in family visits); Torricellas v. Poole, 954 F.Supp. 1405, 1414 (C.D. Cal. 1997) (no liberty interest in conjugal visitation). The Fifth Circuit has found that a mother's fundamental interest in breast feeding her infant was abridged by her incarceration. Southerland v. Thigpen, 784 F.2d 713, 716 (5th Cir. 1986). Finally, the Sixth Circuit also has found no "implicit due process right to prison visitation." Bazzetta v. McGinnis, 430 F.3d 795, 804 (6th Cir. 2005).

Plaintiff posits two other bases for his claimed liberty interest in family visitation. The first is the "special relationship" between inmates and the correctional system, which arises because the prisoner is totally dependent on the state for the provision of such basic needs as medical care, food and safety. Opp'n at 20 ¶ 57. In plaintiff's view, because the "state created this program making it possible for a life prisoner to father a child, the Constitution through the Fourteenth Amendment imposes duties and obligations on defendants to provide the means necessary for both parent and child to exercise family rights in a meaningful manner." Id.

/////

The Supreme Court has defined the limits of the "special relationship" doctrine:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs- e.g., food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200 (1989) (internal quotation, citation, footnote omitted). Relying on Deshaney, the Ninth Circuit has explained that the "special relationship" cases "stand for the proposition that the government has an affirmative obligation to facilitate exercise of constitutional rights by those in its custody only when the circumstances of the custodial relationship directly prevent individual exercise of those rights." Lipscomb by DeFehr v. Simmons, 962 F.2d 1374, 1379 (9th Cir. 1992). In Lipscomb, the court rejected a challenge to Oregon regulations that provided stipends to foster parents who were not related to their foster children, while denying the same payments to the child's relatives. The court observed that the policy did not prohibit the children from living with their relatives and found that the state had no "affirmative obligation to fund plaintiffs' exercise of a right to maintain family relationships. . . ." Id. As in Lipscomb, the state has not prevented plaintiff from maintaining his relationship with his child: it has not sought to terminate his parental rights over his daughter. Moreover, the state has permitted him to visit with his daughter. MSJ, Beck Decl. ¶ 3 & Attach. 1. Even assuming the state's "special relationship" with plaintiff requires the state to assist plaintiff in maintaining his parental role, that relationship does not extend so far as plaintiff proposes.

The Third Circuit has considered a jail policy that required pregnant female inmates who sought elective abortions to secure a court-ordered "own recognizance" release for the procedure and to provide their own funding. Monmouth County Correctional Institutional

1  Inmates v. Lanzaro, 834 F.2d 326, 328 (3d Cir. 1987). Although the case suggests that prisoners
2  retain their right to secure elective abortions, it does not govern the resolution of this case; rather
3  this court relies on the cases cited above, which directly address a prisoner's right to visitation
4  and conjugal relations while incarcerated.

5  Moreover, to the extent that Monmouth County applies, it directs this court to
6  consider the validity of the regulation under the test established in Turner. Under Turner, a court
7  must "accord substantial deference to the professional judgment of prison administrators" and
8  consider four factors: whether the regulation has a rational connection to a legitimate
9  governmental interest, whether alternative means are open to the inmate to exercise the right,
10 what impact an accommodation would have on guards and other inmates and prison resources,
11 and whether there are ready, easy-to-implement alternatives to the regulation that would
12 accommodate the inmate's rights. Overton, 539 U.S. at 132; Turner, 482 U.S. at 89-91. The
13 burden is on the inmate to disprove the validity of the challenged regulation. Overton, 539 U.S.
14 at 132.

15 In this case, the asserted governmental interests are institutional and societal
16 security and the extension of the privilege of family visitation to those who stand to benefit by it
17 the most, those with established parole dates. MSJ, Ex. B, Attach. A at 290-291, 519.

18 In Overton, 539 U.S. at 133, the Court found the restrictions on visits challenged
19 in that case were rationally related to security, which is "perhaps the most legitimate of
20 penological goals. . . ." See also Block v. Rutherford, 468 U.S. 576, 586 (1984) ("[t]hat there is a
21 valid, rational connection between a ban on contact visits and internal security of a detention
22 facility is too obvious to warrant extended discussion."). Deferring as it must to the judgment of
23 prison administrators, the court cannot find it irrational to prevent a prisoner from having an
24 unsupervised visit unless he has earned a parole date, which he must do by showing that his
25 release would not endanger public safety. See Hayward v. Marshall, 512 F.3d 536 (9th Cir.
26 2008). Moreover, the court does not find it irrational for prison administrators to use their

resources on behalf of those who expect to be released within a determinate amount of time. See 15 Cal. Code Regs. § 3170(a) (recognizing "the value of inmate visitation as a means of increasing safety in prisons, maintaining family and community connections, and preparing inmates for successful release and rehabilitation").

Plaintiff argues that there is no rational relationship between the restriction and these interests because he is not guaranteed a parole date even if his institutional record is "amazing" and because of the "no parole" policy. Tuvalu Decl., Ex. E (Parole Board Decision On Appeal, which says, in part, "even an 'amazing in-prison record' does not, of itself, demonstrate what the prisoner's behavior might be out of prison or mandate a finding of suitability"). He also argues there is no rational fit between the policy and the interests because family visits have been given to lifers without a parole date who have become informants.

Neither of these arguments demonstrates that the policy lacks a rational connection to the asserted interests. Even if an "amazing" in-prison record is no guarantee of parole, a dismal record almost certainly will be used to deny a parole date. Cal. Pen. Code § 2402(c)(6) (among the factors suggesting unsuitability for parole is that "the prisoner has engaged in serious misconduct in prison or jail."). The policy thus provides an incentive toward good behavior.

For purposes of resolving the pending motion, the court will assume that lifers have been given family visits once they became informers, the proof of which petitioner pursued in discovery. This, too, does not render the fit between the government's policy and the reasons irrational: extending benefits to those who provide information relating to threats to correctional officers or other inmates is connected to the maintenance of institutional security.

The second Turner factor is whether there are alternative means of exercising the rights involved. Plaintiff has received visits from his wife and children and is able to be in touch through letter and telephone calls. MSJ, Beck Decl. ¶ 3 & Attach. 1; Declaration of Tutuila Tuvalu in Opposition to Summary Judgment (Tuvalu Decl. II) ¶¶ 27-29. That the visits lack

1  privacy or that the phone calls are expensive is not determinative: as the Supreme Court has
2  recognized, "[a]lternatives to visitation need not be ideal; . . . they need only be available."
3  Overton, 539 U.S. at 135. "Prison officials are simply not required, as a matter of constitutional
4  law, to provide [an inmate] with the 'best method' of raising his child." Wirsching v. Colorado,
5  360 F.3d 1191, 1200-01 (10th Cir. 2004).

6        The third factor is a consideration of the impact any alteration of the policy would
7  have on guards, other inmates, or the allocation of resources. Defendants have posited that
8  expanding the family visiting program would necessarily mean that other inmates already
9  approved for family visits would have their access to the program reduced. MSJ, Beck Decl. ¶ 4.
10 As the Supreme Court recognized, retooling a visitation program might cause a "reallocation of
11 the prison system's financial resources . . . ." Overton, 539 U.S. at 135. Plaintiff has not
12 rebutted this concern.

13       Finally, the court must consider alternatives to the regulations that might
14 accommodate the inmate's rights. "*Turner* does not impose a least-restrictive- alternative test,
15 but asks instead whether the prisoner has pointed to some obvious regulatory alternative that
16 fully accommodates the asserted right while not imposing more than a *de minimis* cost to the
17 valid penological goal." Id. at 136. Plaintiff has not suggested any such alternative.

18   B. Equal Protection

19       Plaintiff alleges that the requirement that an inmate earn official trust by acting as
20 an informant as a precondition to the restoration of his right to family visits renders the policy
21 irrational, particularly in light of the dangers faced by informants and even their families. This
22 purported distinction between groups of lifer prisoners violates the Equal Protection Clause, in
23 plaintiff's view. Am. Compl. ¶¶ 63-71. As noted above, for purposes of this analysis, the court
24 will assume that life prisoners who have provided information to the authorities are given family
25 visits they would otherwise be ineligible to receive.
26 /////

1   The essence of the Equal Protection Clause is that "the State must govern
2   impartially." Jones v. Helms, 452 U.S. 412, 423 (1981). Accordingly, the clause "provides a
3   basis for challenging legislative classifications that treat one group of persons as inferior or
4   superior to others, and for contending that general rules are being applied in an arbitrary or
5   discriminatory way." Id. at 423-24. The equal protection guarantee "is essentially a direction
6   that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living
7   Center, 473 U.S. 432, 439 (1985).

8   If a particular legislative classification is based on an inherently suspect
9   classification or impinges on the exercise of a fundamental right, then the state must show that
10  the classification is precisely tailored to serve a compelling governmental interest. Plyler v. Doe,
11  457 U.S. 202, 216-17 (1982); Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001).
12  Prisoners are not a suspect class. See Rodriguez v. Cook, 169 F.3d 1176, 1179 (9th Cir. 1999)
13  Moreover, as noted above, plaintiff does not have a fundamental right to a particular kind of visit
14  or to a visit with a particular person. Kentucky Department of Corrections, 490 U.S. at 460.

15  "[A] classification neither involving fundamental rights nor proceeding along
16  suspect lines is accorded a strong presumption of validity." Heller v. Doe, 509 U.S. 312, 319
17  (1993). Nevertheless, "[t]here must be a rational basis for distinctions by prison officials in the
18  application of visitation policies to similarly situated inmates." Africa v. Vaughan, 998 F.Supp.
19  552 (E.D. Pa. 1998); see also Daniel v. Rolfs, 29 F.Supp.2d 1184, 1188 (E.D. Wash. 1998).
20  However,

> equal protection is not a license for courts to judge the wisdom,
> fairness, or logic of legislative choices. In areas of social and
> economic policy, a statutory classification that neither proceeds
> along suspect lines or infringes fundamental constitutional rights
> must be upheld against equal protection challenge if there is any
> reasonably conceivable state of facts that could provide a rational
> basis for the classification.

25  Federal Communications Commission v. Beach Communications, Inc., 508 U.S. 307, 313
26  (1993). Moreover, "it is entirely irrelevant for constitutional purposes whether the conceived

reason for the challenged distinction actually motivated the legislature." Id. at 315.

In Bills v. Dahm, 32 F.3d 333 (8th Cir. 1994), the Court of Appeals considered a prison policy that permitted some incarcerated mothers to have overnight visits with their children while denying incarcerated fathers the same type of visitation. The court found that "because [it] could make a case for the relationship between the official action" and the legitimate penological objective of security, there was no equal protection violation.

Plaintiff argues that it would be more rational to reward informants with "hookers from [the] street. . . [steak] and lobster dinners. . . DVD players. . . ." Opp'n at 41 ¶ 104. Whether any particular course would be more rational is not for this court to decide in considering plaintiff's equal protection challenge: for rational basis analysis, what is necessary is a rational connection between the difference in treatment and the underlying interest. In this case, the court cannot find it irrational for prison officials to offer a sought-after privilege to those who provide information about potential threats to the security of the institution, correctional officers, and other inmates. See United States v. Horn, 946 F.2d 738, 746 (10th Cir. 1991) (difference in sentence between those who provided information to the government and those who did not is rational and did not violate equal protection).

This court does not make policy nor can it pass on the ultimate wisdom of the rules that have deprived plaintiff of his overnight visits with his family. Based on established law and the application of the rational basis test, plaintiff's equal protection challenge fails.

IV. Plaintiff's Motion For Injunctive Relief'

Plaintiff has filed a motion for injunctive relief, challenging the manner in which prison officials have collected the filing fee for this action from his trust account. He suggests that his fee has been paid, but that prison officials have continued to withhold money from his account.

/////

/////

According to the court's financial officer, however, only $44.58 of the $150 filing fee has been collected as of the date of these findings and recommendations. He has not shown that any perceived irregularities in prison accounting have harmed him.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (docket no. 106) be granted; and

2. Plaintiff's motion for injunctive relief (docket no. 163) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 3, 2008.

_____
U.S. MAGISTRATE JUDGE